IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| Christopher Giles, </br> Plaintiff, | ) </br> ) </br> ) | |
| v. | ) </br> ) | 1:13cv179 (LO/JFA) |
| Benjamine Ulep, et al. </br> Defendants. | ) </br> ) </br> ) | |

MEMORANDUM OPINION

Christopher Giles, a Virginia inmate proceeding pro se, has filed a civil rights action, pursuant to 42 U.S.C. § 1983, alleging that medical staff at Sussex II State Prison were deliberately indifferent to his serious medical needs. Plaintiff applied to proceed in forma pauperis, which the Court granted by its July 31, 2013 Order. By that same Order, the Court dismissed three of plaintiff's named defendants for failure to state claim, pursuant to 28 U.S.C. § 1915A(b)(1). The remaining defendants were directed to file an answer or other responsive pleading. On August 13, 2013, defendants filed a Motion to Dismiss, pursuant to Fed. R. Civ. P. 12b(6). Plaintiff was given an opportunity to file responsive materials, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and has filed a reply to defendants' Motion to Dismiss (Docket No. 15) and a Response to Defendant's Reply (Docket No. 17). For the reasons that follow, defendants' Motion to Dismiss must be denied, in part, and granted, in part.

I. Background

As plaintiff's complaint is before the Court on defendants' Motion to Dismiss, the alleged facts must be presumed to be true. Plaintiff's complaint centers around back pain and cauda equine syndrome symptoms he began to show in early 2008. Am. Compl. at 3; Dkt. No. 5. Though plaintiff provides a detailed chronology of his repeated requests for medical care, his claims are

1

easily summarized. From May 15, 2008, through October 5, 2010, while incarcerated at Sussex II State Prison ("Sussex"), plaintiff repeatedly sought medical treatment for increasingly severe back pain and no less than six times "pleaded" to have an MRI and surgery. Plaintiff was seen by defendant Dr. Ulep ("Dr. Ulep") from May 15, 2008, till July 12, 2010. Defendant Dr. Dooley ("Dr. Dooley") replaced Dr. Ulep at some point between July 12, 2010 and October 5, 2010, when he first saw and treated plaintiff. Each interaction will be discussed below.

On May 15, 2008, plaintiff first sought treatment from Dr. Ulep complaining that he was having difficulty and experiencing pain while climbing on and off his top bunk. Id. at 4. Plaintiff asked Dr. Ulep about a potential EMG study and surgery. Id. at 3-4. Dr. Ulep "laughed him off and said there was no way PHS was going to approve that expenditure, and he stated that he would not recommend it anyway." Id. at 4. Dr. Ulep wrote plaintiff a permanent medical detail for a bottom bunk and prescribed him pain medication. Id. at 4.

After consulting with a nurse that noted he was "tender to touch, had impaired range of motion, and had numbness and weakness of extremities," plaintiff again saw Dr. Ulep on July 1, 2008. Id. at 4-5. Plaintiff also told Dr. Ulep of "excruciating lower back pain" and inquired into having an MRI. Id. at 5. Dr. Ulep "laughed plaintiff off again and reiterated that there is no way PHS was going to approve that expenditure and stated he would not recommend it anyway." Id. Dr. Ulep then examined X-rays of plaintiff that had previously been taken at two different institutions. Id. After noting the two X-rays had conflicting results, Dr. Ulep ordered another X-ray. Id.

On July 2, 2008, plaintiff had the ordered X-ray taken, which revealed plaintiff had a narrowing of the LS5 disc. Id. On October 21, 2008, Dr. Ulep saw plaintiff and, for the first time, reviewed and discussed plaintiff's July 2 X-Ray with plaintiff. Id. at 6. After Dr. Ulep told plaintiff that he had a chronic degenerative disease, plaintiff requested an MRI and surgery. Id. Dr. Ulep

"laughed plaintiff off saying 'no way' . . . explain[ing] that PHS would not approve this kind of expenditure and therefore, he would not waste his time and recommend it." Id. From October 21, 2008, through November 30, 2009, plaintiff did not seek treatment because at their October 21 appointment Dr. Ulep indicated he would not recommend further treatment. Id.

On December 16, 2009, plaintiff again saw Dr. Ulep because he was experiencing frequent numbness on the lower left side of his body and immobility. Id. at 7. Plaintiff asked about an MRI and surgery to which Dr. Ulep gave an "unequivocal 'no'" because PHS would not "approve such an [sic] expenditure and therefore, he would not recommend it." Id. Dr. Ulep then told plaintiff he "was wasting his time in continuing to ask about it."

On March 15, 2010, plaintiff sought treatment from Dr. Ulep for severe lower back pain and numbness down his left side and "pleaded with Dr. Ulep for an MRI and surgery." Id. Dr. Ulep again explained that there was "nothing to be done because PHS would not approve this expenditure and therefore, he would not waste his time in recommending it." Id. Dr. Ulep marked plaintiff's medical chart to denote chronic LS degenerate disease with uncontrolled pains. Id. at 8. On May 12, 2010, Dr. Ulep updated plaintiff's chart adding "last low back evaluation showed normal spinal ROM in spite [sic] of abnormal mild LS5 changes." Id.

On October 4, 2010, plaintiff complained that he "was suffering immobility" and met with a nurse who noted limping, gait unsteady, walking very slow, numbness in hamstring, calf, and bottom of left foot pedal, swelling present, limited ROM, and "Prick" sensation absent from left calf to bottom of left foot. Id. at 8-9. On October 5, 2011, plaintiff met with Dr. Dooley and recounted his history with Dr. Ulep. He then asked Dr. Dooley for an MRI and surgery. Dr. Dooley stated he needed to first order examinations before sending plaintiff to a specialist. Dr. Dooley ordered bedside meals and placed a request to have an EMG Study conducted on December 28, 2010.

3

Between October 18, 2010 and October 31, 2010, plaintiff suffered "constant excruciating pain" in his back and butt, was unable to move, and had bladder and bowel dysfunction. Id. at 10. On November 1, 2010, security rushed plaintiff to the infirmary after plaintiff stated his "system had shut down." Id. at 11 (internal quotations omitted). Upon examination, Dr. Dooley discovered feces in plaintiff's rectum and that plaintiff was without feeling in his back. Id. Dr. Dooley "suddenly became very alarmed and . . . stated, 'I have to get you over to the emergency room ASAP before this paralyzes you." Id. Plaintiff was then transferred to VCU Medical Center, where an MRI was immediately performed. Id. The MRI showed "severe damage to plaintiff's lower back requiring immediate surgery before he went completely paralyzed." Id.

On November 2, 2010, VCU surgeons performed a lumbar left L5-S1 microdiskectomy on plaintiff's back. Id. VCU discharged plaintiff on November 5, 2010. Id. On January 25, 2011, after seeking medical care from a nurse in December, plaintiff saw Dr. Dooley and told Dr. Dooley that he was still suffering pain, could "hardly walk," and had bladder and bowel dysfunction. Id. at 12. Plaintiff asked Dr. Dooley why the November 2, 2010 surgery had not improved his condition. Id. Dr. Dooley said "his condition would not improve because the surgery was not performed sooner, and that the resulting effects would be permanent." Id.

Plaintiff brought suit in the Circuit Court for the County of Sussex, Virginia on January 25, 2012. Pl.'s Sworn Aff. Concern. Statute of Lim. at ¶ 15. That complaint dealt with the same facts as described above but named "Commonwealth of Virginia" as the sole defendant. Defs.' Mot. Dismiss, Ex. 1. The court dismissed the suit per plaintiff's Motion for Nonsuit. Id. at Ex. 2. Plaintiff then filed the instant action on or about January 25, 2013.

## II. Statute of Limitations

In their motion to dismiss, defendants argue that plaintiff's complaint is barred by the applicable statute of limitations. Defs.' Mot. Dismiss at 14. Defendants argue that plaintiff's claim

4

accrued "when he suffered alleged injuries, no matter how slight, not when he realized the full extent of his alleged his injuries" and cite two cases decided by the Supreme Court of Virginia. Id. at 14. Thus, according to defendants, plaintiff's claim against Dr. Ulep accrued at the latest on October 21, 2008, the date on which plaintiff stopped seeking his medical assistance. Id. Similarly, defendants argue plaintiff's claim against Dr. Dooley accrued on October 18, 2010, at the latest, the day defendant Dooley last saw plaintiff before he was immediately referred for surgery in November 2010. Id.

Plaintiff responds by arguing his claims did not accrue until January 25, 2011, the date on which he realized defendants actions resulted in permanent damage. Pl.'s Sworn Aff. Concern. Statute of Lim. at ¶ 15.

Accrual of Plaintiff's Claim

There is no federal statute of limitations for § 1983 claims, so the state limitations period which governs personal injury actions is applied. See Wilson v. Garcia, 471 U.S. 261, 280 (1985). Virginia has a two-year statute of limitations for personal injury claims under Virginia Code. § 8.01-243(A), which is the applicable statute of limitations for this action. See Shelton v. Angelone, 148 F. Supp. 2d 670, 677 (W.D. Va. 2001), aff'd, 49 Fed. Appx. 451 (4th Cir. Oct. 30, 2002) (unpublished opinion).

When a cause of action accrues, however, is a federal question. Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir.1995)(en banc). A cause of action under § 1983 accrues and the statute of limitations begins running "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Id. "Thus, for purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice-e.g., by the knowledge of the fact of injury and who caused it-to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." Id. An

5

inmate's § 1983 action is commenced for purposes of the statute of limitations as soon as he delivers his complaint to prison authorities for mailing. Lewis v. Richmond City Police Dep't, 947 F.2d 733 (4th Cir.1991). "In Virginia § 1983 cases, then, if an inmate has not delivered his complaint to prison officials for mailing within the two year period following the time when he knew or had reason to know of his alleged injury, that inmate is barred by the Virginia statute of limitations from bringing suit." Luck v. Danville City Jail, No. 7:06cv726, 2007 WL 30307 *1 (W.D. Va. Jan. 04, 2007), aff'd, 234 Fed. Appx. 140 (4th Cir. Jul. 24, 2007).

Plaintiff's claim accrued on October 5, 2010, at the earliest. Defendants' reliance on the Virginia Supreme Court's cases that support a cause of action accruing when plaintiff incurs "any injury" is in error. As the Fourth Circuit has made clear, when a cause of action accrues is a federal question. See Nasim, 64 F.3d at 955 (4th Cir.1995)(en banc). Though plaintiff did not learn of his injury until January 15, 2011, the date he learned he had suffered permanent damage, his own allegations show he had notice on October 5, 2010. Am. Compl. at 9. This was the first date at which plaintiff's allegations show he had "knowledge of the fact of injury" such that he was on inquiry notice because this is the first date he expressed concern over any permanent damage. See Nasim, 64 F.3d at 955 (4th Cir.1995)(en banc). As such, plaintiff's claim accrued on October 5, 2010.[1]

Tolling of the Statute of Limitations

Plaintiff argues that pursuant to Va. Code § 8.01-229(E)(3), his case before the Virginia court tolled the statute of limitations. Id. at ¶ 18. Defendants respond by arguing, § 8.01-229(E)(3) did not apply because his state case was against a different defendant. Defs.' Mot. Dismiss at 15.

Federal courts are "obligated not only to apply the analogous state statute of limitations to

---

1 Notably, this is also about the date that defendants concede plaintiff had a serious medical need. Mot. Dismiss at 9 ("Defendants admit that, on their face, Plaintiff's allegations relating to the condition that developed in October 2010, would appear to constitute a serious medical need for § 1983 analysis.")

6

federal constitutional claims brought under § 1983, but also to apply the State's rule for tolling that statute of limitations." Scoggins v. Douglas, 760 F.2d 535, 537 (4th Cir. 1985) (citing Board of Regents v. Tomanio, 446 U.S. 478, 484–86 (1980)). Virginia Code § 8.01-229(E)(3) states,

> If a plaintiff suffers a voluntary nonsuit as prescribed in § 8.01-380, the statute of limitations with respect to such action shall be tolled by the commencement of the nonsuited action, and the plaintiff may recommence his action within six months from the date of the order entered by the court, or within the original period of limitation, or within the limitation period as provided by subdivision B 1, whichever period is longer. This tolling provision shall apply irrespective of whether the action is originally filed in a federal or a state court and recommenced in any other court, and shall apply to all actions irrespective of whether they arise under common law or statute.

This section has been interpreted to "provide[] . . . a party who voluntarily dismisses a cause of action to recommence it within six months, whether in state or federal court. U.S. ex rel. Herndon v. Appalachian Regional Community Head Start, Inc., 572 F.Supp.2d 663, 664 (W.D.Va. 2008) "This tolling provision saves all of the operative facts supporting any right of action claimed, regardless of the particular label." Id. (citing Hatfill v. New York Times Co., 416 F.3d 320, 334-35 (4th Cir.2005).

Virginia Code § 8.01-380(E)(3) controls plaintiff's case. This section tolled Virginia's two-year statute of limitations when plaintiff filed his suit in the Virginia state court. Though defendants argue this tolling provision is not applicable because there is not an identity of parties between the two lawsuits, Defs.' Mot. Dismiss at 15, this argument must be rejected. The case defendants rely on to support their proposition that § 8.01-380(E)(3) requires an identity of the parties between defendants, Casey v. Merck & Co., Inc., 284 Va. 411 (Va. 2012), does not support such a finding. Casey addressed the issue of whether the applicable Virginia tolling provision was triggered upon the filing of a cross-jurisdictional putative class action. The court's analysis focused on the identity of parties between the plaintiffs. 284 Va. at 417 ("For tolling to be permitted, the subsequently filed [class] action must be filed by the same party in interest on the

7

same cause of action in the same right"). There is no argument that the plaintiff is not the same in this and in the Virginia lawsuit.

Defendants go on to argue that there is not an identity of the parties because the defendants are different. However, as plaintiff correctly points out any difference between the defendants is merely illusory. Both cases addressed the same alleged wrongs by the same individuals – Dr. Ulep and Dr. Dooley. While it is true that Dr. Ulep and Dr. Dooley were not named in plaintiff's state suit, there was clearly no surprise to defendants as counsel for the defendants is the same in this suit as it was in plaintiff's state suit. Because § 8.01-229 tolled Virginia's statute of limitations, plaintiff's instant complaint was timely filed when he commenced the instant action within six months of his nonsuit. See Va. Code § 8.01-380(E)(3).

### III. Standard of Review

A motion to dismiss tests whether a complaint states a cause of action upon which relief can be granted, which is determined by "the familiar standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." Sumner v. Tucker, 9 F. Supp. 2d 641, 642 (E.D. Va. 1998). That is, the alleged facts are presumed true, and the complaint should be dismissed only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Where, as here, a complaint is filed by a prisoner acting pro se, it must be construed liberally no matter how unskillfully it is pleaded. Haines v. Kerner, 404 U.S. 519 (1972). A pro se

litigant thus is not held to the strict pleading requirements demanded of attorneys. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106–07 (1976); <u>Figgins v. Hudspeth</u>, 584 F.2d 1345 (4th Cir. 1978), <u>cert. denied</u>, 441 U.S. 913 (1979). For these reasons, a court's "power summarily to dismiss a prisoner's pro se complaint is limited." <u>Figgins</u>, 584 F.2d at 1347.

## IV. Analysis

To succeed on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate facts sufficient to show that jail officials were deliberately indifferent to a serious medical need. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976); <u>Staples v. Va. Dep't of Corr.</u>, 904 F.Supp. 487, 492 (E.D.Va. 1995). To establish that inadequate medical treatment rises to the level of a constitutional violation, a plaintiff must satisfy two distinct elements. First, he must show a sufficiently serious medical need. <u>See, e.g.</u>, <u>Cooper v. Dyke</u>, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious). Second, he must demonstrate that defendants exhibited deliberate indifference to that medical need "by either actual intent or reckless disregard." <u>Estelle</u>, 429 U.S. at 106; <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990). The prisoner must demonstrate that defendants' actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Id.</u> (citations omitted). Under this second prong, an assertion of mere negligence or even malpractice is not enough to state an Eighth Amendment violation; "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." <u>Estelle</u>, 429 U.S. at 106; <u>see also</u>, <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986); <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990).

"A prisoner can establish a claim of deliberate indifference 'by a showing of grossly

inadequate care as well as by a decision to take an easier but less efficacious course of treatment.'" King v. US, __ Fed. Appx __ (4th Cir. July 31, 2013) (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999)). "This standard can be satisfied when the need for treatment is obvious yet prison officials merely provide medical care which is so cursory as to amount to no treatment at all." Id. (internal quotations omitted). The Fourth Circuit has explained that when a prisoner is provided "some treatment" appropriate for his condition, this fact does not necessarily satisfy the Eighth Amendment's requirement of *"constitutionally* adequate treatment." De'lonta, 708 F.3d at 526 (emphasis in original).

Still, a prisoner's disagreement with medical personnel over the course of his treatment will not support an Eighth Amendment cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam); Harris v. Murray, 761 F. Supp. 409, 414 (E.D. Va. 1990). Thus, "a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107.

A. Defendant Dr. Ulep

Taking plaintiff's allegations as true, plaintiff has stated a claim that Dr. Ulep was deliberately indifferent to his serious medical needs. Plaintiff's allegations show he suffered from a serious medical condition. Plaintiff's medical chart stated that plaintiff had "chronic LS degenerate disease with uncontrolled pains." Am. Compl. at 7. Such type of chronic and degenerative disease that is accompanied by severe pain and numbness is the type of medical condition that is serious enough to meet the first element of showing a sufficiently serious medical need. See Loe, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious).

Plaintiff alleges that he met with Dr. Ulep on March 25, 2010 and "pleaded for help" about his severe lower back pain and numbness down his left side and "pleaded with Dr. Ulep for an

10

MRI and surgery." Am.Ccompl. at 7. Dr. Ulep stated "there was nothing that could be done *because PHS would not approve this expenditure* and therefore, he would not waste his time in recommending it." Id. (emphasis added). Taking these allegations as true, plaintiff has alleged sufficient facts to satisfy Rule 12(b)(6). See Iqbal, 556 U.S. at 677. As such, plaintiff has stated a claim against Dr. Ulep and defendants' motion to dismiss must be denied as it relates to Dr. Ulep.

B. Defendant Dr. Dooley

While plaintiff alleges that Dr. Ulep was indifferent to his serious medical need, plaintiff's allegations against Dr. Dooley show that his actions were opposite to Dr. Ulep's. Plaintiff's first interaction with Dr. Dooley occurred on October 5, 2010. Am. Compl. at 9. At this first meeting, defendant prescribed pain medication, ordered bedside meals and placed a request for an EMG study. Id. While Dr. Dooley told plaintiff not to "get his hopes" up because of financial restrictions, Dr. Dooley still ordered the EMG. This is an important distinction because where Dr. Ulep was making a financial decision in letting his insight into his employer's practice of refusing requests for treatment dictate his action, Dr. Dooley made a medical one. Id. Dr. Dooley choose to request an EMG study, while letting his insight on his employer's practice be another way to advise his patient – not dictate his prescribed course of treatment. Ordering an EMG study, prescribing bedside meals, and prescribing pain medication can hardly be called grossly inadequate. See King, __ Fed. Appx. At *3.

Further on October 18, 2010, Dr. Dooley responded, within in hours, to plaintiff's request for help with his mobility by providing him a cane. Am. Compl. at 9. When Dr. Dooley next saw plaintiff on November 1, 2010, it was he that ordered plaintiff to be rushed to the emergency room. Id. at 11. Dr. Dooley's quick responses on both October 18 and November 1 show that he was not"[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." See Estelle, 429 U.S. at 106. Therefore, defendants' Motion

11

to Dismiss will be denied as to Dr. Dooley.

## V. Conclusion

For the above-stated reasons, defendants' Motion to Dismiss will be denied, in part, and granted, in part. An appropriate Order shall issue.

Entered this 5th day of November 2013.

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge